# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BURT LAKE BAND OF OTTAWA** | * | |
| **AND CHIPPEWA INDIANS** | * | |
| 6461 East Brutus Road, | * | |
| P.O. Box 206 | * | |
| Brutus, Michigan 49716, | * | |
| | * | Case No. _____ |
| **Plaintiff**, | * | |
| | * | Judge |
| v. | * | |
| | * | |
| **THE HONORABLE SALLY JEWELL**, | * | |
| 1849 C Street, N.W., | * | |
| Mail Stop 7328 | * | |
| Washington, D.C. 20240, | * | |
| In her official capacity as Secretary of the Interior, | * | |
| | * | |
| **THE HONORABLE** | * | |
| **LAWRENCE ROBERTS**, | * | |
| 1849 C Street, N.W., | * | |
| Mail Stop 3642 | * | |
| Washington, D.C. 20240, | * | |
| In his official capacity as Acting Assistant | * | |
| Secretary – Indian Affairs, | * | |
| Department of the Interior, | * | |
| | * | |
| **UNITED STATES** | * | |
| **DEPARTMENT OF INTERIOR**, | * | |
| 1849 C Street N.W., | * | |
| Washington, DC 20240, | * | |
| | * | |
| **Defendants**. | * | |

## <u>COMPLAINT</u>

Plaintiff Burt Lake Band of Ottawa and Chippewa Indians brings this lawsuit against the Honorable Sally Jewell, Secretary of the Interior, Lawrence Roberts, Acting Assistant Secretary — Indian Affairs, and the Department of the Interior, for violations of the Administrative Procedure Act ("APA") and the Equal Protection and Due Process components of the Fifth Amendment, and requests that this Court enter an order to compel Defendants to fairly review

and act upon the Plaintiff's multiple petitions for federal recognition as a sovereign Indian nation under governing federal statutes, and alleges as follows:

## PARTIES

1. Plaintiff Burt Lake Band of Ottawa and Chippewa Indians ("Burt Lake Band" or "the Band"), formerly called the Cheboygan (or Cheboigan) Band of Ottawa and Chippewa Indians ("Cheboygan Band"), is a sovereign Indian Nation.  The Burt Lake Band's organization is located in Brutus, Michigan.  The membership of the Burt Lake Band is directly descended from the historic Cheboygan Band,[1] which has twice been recognized as a sovereign Tribe by Treaty with the United States, through the Treaty of Washington, ratified on March 28, 1836 (7 Stat. 491), and through the treaty commonly known as the 1855 Treaty of Detroit, ratified by the Senate on April 15, 1856 (11 Stat. 621).

2. Defendant Sally Jewell is sued in her official capacity as the Secretary of the Interior, in which capacity she is responsible for the overall administration of the Department of the Interior, and, in particular, the Bureau of Indian Affairs ("BIA"), an agency within that Department tasked with managing the federal government's relationship through various agreements with Indian Tribes, Nations and Bands within the United States. 43 U.S.C. § 1457.

3. Defendant Lawrence Roberts is sued in his official capacity as the Acting Assistant Secretary of Interior – Indian Affairs, in which capacity he is responsible for administering the fiduciary obligations of the United States government towards Native Americans under governing laws, including 25 U.S.C. §§ 2 and 9. Among the duties and responsibilities of the Assistant Secretary-Indian Affairs is to make a final decision on petitions to acknowledge an Indian Tribe under the authority delegated to him by the

---

[1] The Band has been named for its proximity to the lake it first settled near. The Cheboygan Band settled upon Cheboygan Lake, but when it was renamed Burt Lake, the Band became known as the Burt Lake Band. *See infra* note 8.

Secretary under Part 83 of Title 25, Code of Federal Regulations; and to re-affirm the status of an Indian Tribe, Nation or Band—a process routinely sought due to the inadequacy of records and the federal government's long history of subjugating Indian peoples—which has previously been recognized by the United States on a government-to-government basis.

4. Defendant Department of Interior ("DOI") is a cabinet-level agency of the United States and is responsible for managing the relations with Indian tribes through the BIA and its Acting Secretary, Lawrence Roberts.  The DOI is also responsible for promulgating and insuring compliance with its regulations.

<u>**JURISDICTION AND VENUE**</u>

5. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action raises substantial questions of federal law under Plaintiff's Treaties with the United States, the APA (5 U.S.C. § 701-706 et seq.), and the Federally Recognized Indian Tribe List Act of 1994. 108 Stat. 4791 (1994) (codified at 25 U.S.C. § 5130).

6. The United States has waived sovereign immunity from suit under 5 U.S.C. § 702 because Plaintiff seeks review of agency action.  This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1391(e) as they are federal agencies and officers of the United States.

7. There is an actual case or controversy within the meaning of 28 U.S.C. §§ 2201 and 2202 between the parties that invokes the jurisdiction of this Court regarding decisions and final agency actions by the DOI and the Secretary that harm the Burt Lake Band and are subject to review by this Court.  Pursuant to 5 U.S.C. § 704, the Burt Lake Band has exhausted all federal administrative remedies.  This case is ripe for judicial review.

## NATURE OF THE ACTION

8. For more than a century, the Burt Lake Band has suffered from the failures of the Bureau of Indian Affairs ("BIA"), which is at the direction of Defendant-Secretary Roberts, and the Department of the Interior ("DOI") to carry out their obligations under the laws and treaties of the United States.  These failures have resulted in an unlawful situation in which the Burt Lake Band is the last Tribe in Michigan that is "landless." The government coined the term "landless" for tribes that did not own or live on a communal reservation.  Many of these "landless" tribes did possess land, but federal treaties provided the members of various tribes with individual allotments of land, as opposed to a communal reservation, in an attempt to "civilize" tribes.  However, the federal government failed to apply an organized and uniform method to identify and recognize tribes without a reservation— which is the very reason why the Defendants have denied and continue to deny the Burt Lake Band federal recognition as an Indian Nation.

9. The Indian Tribes, Nations and Bands, which originally owned and possessed the territory of the United States, derive their sovereignty from time immemorial. This sovereignty preexists that of the United States, and it exists independently of any necessity for recognition by the United States.  However, in order to receive the services and programs mandated for Indian Tribes and their members under federal law, a Tribe must be formally recognized as such by the United States under the criteria established by Part 83 of Title 25, Code of Federal Regulations.

10. The United States has twice recognized the Cheboygan Band (the Burt Lake Band's predecessor) as a sovereign and autonomous Indian nation by the Treaty of Washington in 1836 and the Treaty of Detroit in 1855.  These Treaties impose upon the federal government the duty

to provide services and benefits and assist the Burt Lake Band as an Indian tribe living on United States soil.  These Treaties remain in effect today.

11. The federal government last recognized its fiduciary obligations to the Burt Lake Band in 1917, when it brought suit in federal district court against a Michigan man who had burned down the members' homes and had forcibly ejected them from the reservation lands that they had purchased and entrusted to the State of Michigan.  The Burt Lake Band has never regained these lands, and is currently the last "landless" tribe in Michigan that has not been federally recognized again by the BIA's current recognition process, or "re-affirmed," by the United States.

12. Despite the foregoing Treaties, the DOI, acting through the BIA, has mistreated the Band and illegally denied the heirs and descendants of the members of the Band their vested right to be federally recognized just like every other "landless" Michigan tribe, in violation of the Indian Reorganization Act of 1934 ("IRA") (48 Stat. 984) and Part 83 of Title 25 of the Code of Federal Regulations.

13. In 1935, the Burt Lake Band petitioned the BIA to reorganize under the IRA ("IRA Petition"), which allowed sovereign Indian nations to elect leaders who would serve as diplomats in its relationship with the United States.  Defendants have never issued a final decision on the Band's IRA Petition (the "non-decision").  The BIA's failure to accept the Band's reorganization petition wrongfully indicated to future DOI officials that the Band was not a sovereign Tribe and improperly impeded the Band's subsequent attempts to obtain federal recognition necessary to receive the services and programs provided by federal statutes.

14. In 1985, the Burt Lake Band again petitioned the BIA, this time under its new federal acknowledgment process created by the Department's regulations in Part 83 ("Part 83 Petition").

Part 83 provides an avenue to grant federal "acknowledgement" or recognition of an Indian tribe as well as an avenue to re-affirm a previously recognized tribe. A successful petition requires that the Secretary of the Interior place the tribe on the DOI's list, published in the Federal Register, of Indian tribes and bands the United States engages with on a government-to-government basis.  The Part 83 Petition stayed unanswered until 2006, when the BIA denied the Plaintiffs' acknowledgment on subjective, improper, and inequitable grounds, notwithstanding the fact that the agency had granted acknowledgment to other equally-situated "landless" Michigan tribes on the very same grounds.

15. In 2015, the BIA amended Part 83, to prohibit any tribe from ever re-petitioning for acknowledgment under that process. 80 Fed. Reg. 37,862, 37,862 (July 1, 2015), amending 25 C.F.R. § 83.

16. The Burt Lake Band files this lawsuit seeking that the Court enter an order finding that the Defendants' failure to issue a final decision as to the 1935 IRA Petition violates the APA and the Fifth Amendment's constitutional requirements of due process and equal protection. For 80 years, the Defendants' "non-decision" has discriminatorily precluded the Burt Lake Band from receiving necessary benefits and services, such as access to education, health, and welfare programs, which are only available to members of recognized Indian tribes. The Burt Lake Band requests that this Court require that the Defendants rule on its 80-year-old petition for recognition as a sovereign Indian Nation.

17. In addition, the Defendants' 2015 amendment of Part 83, which prohibits re-petitioning for relief from an unlawful denial of acknowledgment, is the Burt Lake Band's only avenue to reaffirming its sovereign status to which it is entitled.  Preventing the Band from re-petitioning the BIA to address the issues presented by the agency's subjective and unlawful

decision, even though current petitioners undergo a less stringent process, continues nearly two centuries of ignored promises, and violations of applicable Treaties and laws of the United States as applied to the Band, and violates the Equal Protection and Due Process components of the Fifth Amendment of the United States Constitution.  That amended rule should be declared unlawful, and the BIA should be required to reconsider the Band's Part 83 Petition so that the federal government can once again honor its responsibilities and obligations under two independent and still-effective federal Treaties as the BIA has done for similarly situated landless Tribes.

18. Finally, this lawsuit requests that this Court exercise its lawful authority and declare that the Burt Lake Band is once again a sovereign Band that deals with the United States on a government-to-government basis.

## FACTUAL BACKGROUND

### A.  The History of the Relationship Between the United States and the Cheboygan Band

#### a.  The Treaty of Washington and The Band's Purchase of Lands Held in Trust For It

19. On March 28, 1836, the Cheboygan Band of Ottawa and Chippewa Indians[2]— along with other Chippewa and Ottawa bands—signed a Treaty together as the "Ottawa & Chippewa Tribe of Indians" with the federal government to cede approximately 14 million acres of land in the eastern half of the Upper Peninsula and the northern and western portion of the Lower Peninsula of Michigan.  In exchange, the United States agreed to make annuity

---

[2]  The tribe's name derives from "Chaboiganing," which was the French spelling of "Zhiibaa'onan," meaning "passage by canoe" or "passing through." The "ing" at the end of the word meant "at." The point of "passing through" was the area of land that connected the inland river to the Mackinac Straits. This became the original home of the Cheboygan Band ("at the passing through")–the first year-round settlement in Northern Michigan—known as Indian Village on Indian Point.  By 1860, the surrounding area was named Village of Cheboygan, now located in Cheboygan County, Michigan.

payments to the separate tribes for a period of 20 years.  This solemn agreement, ratified by Congress, came to be known as the Treaty of Washington. 7 Stat. 491 (1836).

20. The "Ottawa & Chippewa Tribe of Indians" was actually a fictitious, collective name used by the United States government to refer to a loose regional confederation of autonomous bands, and did not accurately reflect the identities of the separate Tribes involved.[3]  The ancestors of the Burt Lake Band, the Cheboygan Band, were represented by Chief Chingassimo or "Big Sail," in negotiations leading to signature of the Treaty of Washington.  That Treaty gave the Cheboygan Band full right and title to "one tract of one thousand acres to be located . . . on the Cheboygan." 7 Stat. 491 (1836). This referred to the area on Indian Point that jutted into Cheboygan Lake.

21. Rather than ratify the Treaty as negotiated, the United States Senate unilaterally modified the clause providing reservations, creating a deadline to execute the allotments within five years "unless the United States grant them permission to remain on said lands for a longer period." 7 Stat. 491 (1836).

22. The Cheboygan Band never had the opportunity to elect what specific lots of land would become their home and reservation because officials of the Office of Indian Affairs never set the land aside for the reservation.  Consequently, the lands in their aboriginal territory were open for sale to, and were purchased by, non-Indian settlers after the five-year deadline. *See* Dr. Robert McClurken, Memorandum to Congressman Robert Davis, *Re: Special Case Status for Little Traverse Bay Bands of Odawa Indians, Little River Band of Ottawa Indians, Burt Lake*

---

[3] *See Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Atty. for W. Div. of Michigan*, 369 F.3d 960, 962 & n.2 (6th Cir. 2004) ("Henry Schoolcraft, who negotiated the 1836 Treaty of Washington on behalf of the United States, combined the Ottawa and Chippewa nations into a joint political unit solely for purposes of facilitating the negotiation of that treaty. In the years that followed, the Ottawas and Chippewas vociferously complained about being joined together as a single political unit.").

*Band of Ottawa and Chippewa Indians*, at 4, Michigan State University (1991) (hereinafter "McClurken Memo").

23. Following the Treaty of Washington, the Cheboygan Band lived in a state of fear and uncertainty believing that the federal government would move its members west of the Mississippi River.  The members considered ways to protect themselves and decided to purchase lands using their annuity payments from the Treaty of Washington.  The Cheboygan Band believed this was the best method to keep the land out of the federal government's hands, and ultimately the hands of non-Indian purchasers. Other signatory Tribes from the Treaty of Washington did the same.

24. From 1845 to 1850, on the advice and with the assistance of United States officials, the Cheboygan Band used Treaty annuity payments to purchase lands and place them in trust with the Governor of Michigan.  The lands were located in Township 36 in Cheboygan County, Michigan.  The Band was advised by the Michigan Superintendent at the Office of Indian Affairs and by the Mackinac Agent (both officials of the federal government) that the trusts created would prevent taxation of their lands, subsequent loss of their land through tax sales, and ultimately, secure the collective future of the Band. *See* Letter of Bruce R. Hamlin, Chairperson of the Burt Lake Band, Inc. to Pres. Barack Obama, September 21, 2015 (attached hereto as **Exhibit A**).

25. The Band entrusted its lands to William A. Richmond, an agent with the Office of Indian Affairs[4]  in Michigan, who, in turn, placed the lands "in trust to the Office of Governor of

---

[4] The Office of Indian Affairs was subsequently renamed the Bureau of Indian Affairs by the DOI on September 17, 1947.  *See* The Bureau of Indian Affairs, https://www.bia.gov/FAQs/ (last updated Dec. 28, 2016 3:42 p.m.).

Michigan and his Successors for the Cheboygan Band of Indians whom which Kie-She-go-we is Chief." *Id.*  Thus, a BIA official helped the Band create these permanent land trusts.

26. The first of six separate land patents was purchased on February 1, 1848 by the "Sheboygan band of Indians of who Kie-she-go-way is Chief." This was Certificate No. 6293, which encompassed 71 acres of what would become a total of 375 acres from six patents. This certificate was signed by President James Polk.  The last of the six parcels was purchased on April 1, 1850 and was Certificate No. 7095, which was signed by President Zachary Taylor. *See* Dr. Richard White, The Ethnohistory of the Burt Lake Indians, Michigan State University (July 17, 1978) (hereinafter "Dr. White Memo").

**b.  The Treaty of Detroit**

27. The United States eventually abandoned the policy of removing the Ottawa and Chippewa bands from Michigan.  By 1854, the United States had shifted its focus from removing Indians to concentrating Tribes on reservations.  Consequently, the federal government called for a new treaty with each of the individual Tribes and Bands of the area to codify this intention.

28. On May 14, 1855, President Franklin Pierce signed an executive order which withdrew 27 townships and partial townships in Michigan from public sale in anticipation of the upcoming treaty negotiations so that no claims would be made on the areas of intended reservations. Executive Orders Relating to Reserves (Vol. I: 1778-1883), at 847 (May 14, 1855).

29. Augustine Hamlin, Jr. of the Cheboygan Band was tapped to be the lead negotiator and spokesman for all Ottawa and Chippewa bands south of the Straits of Mackinaw, in discussions that led to what would be known as the Treaty of Detroit.  In total, 55 headmen from 11 different Michigan bands elected Augustine Hamlin, Jr. as the chosen representative.

30. One of the purposes of this Treaty, known as the Treaty of Detroit, was to establish permanent and distinct communities for these Tribes.  Another purpose was to correct the United

States' mistake in the Treaty of Washington, which classified the various bands as one collective (and fictitious) unit.  The chiefs from independent Tribes came as delegates with power of attorney from their members to negotiate with the government.

31. On the final day of negotiations, Joseph Assagon, the delegate for the Cheboygan Band, stated that his members gave him specific instructions to return with cash from the United States, not land, to purchase more land themselves. The Band had no faith in the security of the government's Treaty-preserved lands given the outcome of the 1836 Treaty of Washington.

32. As a result, neither Assagon nor Chief Ke-she-go-we (also present) signed the Treaty in July 1855.  The two men returned home to Indian Village to consult with its members, and the Band detached itself from the other Ottawas, all of whom signed the Treaty in July 1855.

33. Finally, in 1856, both men signed the Treaty with its amendments at Little Traverse. Article 2 provided forms of payment, but the land allotment scheme remained.

34. Thus, the Cheboygan Band entered into the 1855 Treaty of Detroit as a <u>separate</u> political unit from all other Ottawas in Michigan. They executed the Treaty as an independent and sovereign entity.

35. The Treaty of Detroit was ratified on April 5, 1856.  Article 5 of the Treaty acknowledged that all signatory bands were separate and autonomous governments. The Treaty, based on the federal government's own mistakes, however, "dissolved" an entity that never existed:

> The tribal organization of said Ottawa and Chippewa Indians, except so far as may be necessary for the purpose of carrying into effect the provisions of the agreement is hereby dissolved; and if at any time hereafter, further negotiations with the United States, in reference to any matters contained herein, should become necessary, no general convention of the Indians shall be called; but such as reside in the vicinity of any usual place of payment, or those only who are immediately interested in the questions involved, may arrange all matters between themselves and the United States, without the concurrence of other portions of their people, and as fully and conclusively, and with the same effect in every respect, as if all were represented.

11 Stat. 621 (1856).[5]

36. The purpose of Article 5 was to enable the United States to handle disputes with separate Tribes on a discrete and localized basis.  The federal government believed this approach would be cheaper and more efficient than attempting to negotiate, adjudicate and engage with a fictitious entity that was actually a loose confederation of independent Tribes.

37. Article I of the Treaty of Detroit explicitly granted two allotments to the Cheboygan Band: "*Seventh.* For the Cheboygan band, townships 35 and 36 north, range 3 west." 11 Stat. 621. These two townships were nearby lands to the land already purchased by and held in trust for the Band.

38. Unsurprisingly, most of the allotted land (to the Band and other signatories to the Treaty of Detroit) was unavailable due to persistent land fraud issues and because federal Indian agents failed to execute or convey the allotments provided for in the Treaty.  More concerning was the fact that the United States included in the Treaty of Detroit a requirement that "immediate allotment" was required by a fixed deadline or else the land would be sold to non-Indian settlers. *See* McClurken Memo, at 4.

39. Thus, due to this provision, the allotments guaranteed by the Treaty were never actually patented on behalf of the Cheboygan Band. By comparison, later federal treaties with other Tribes did not include deadlines, which protected many of these Tribes' reservations. The Cheboygan Band had no recourse with the government yet again in its attempts to secure a permanent reservation and home.

---

[5] *See Grand Traverse Band of Ottawa & Chippewa Indians*, 369 F.3d at 962 & n.2 ("To address the [tribes'] complaints, the 1855 Treaty of Detroit contained language dissolving the artificial joinder . . . . This language, however, was not intended to terminate federal recognition of [any separate] tribe, but to permit the United States to deal with the Ottawas and the Chippewas as separate political entities.") (emphasis added).

40. In an attempt to resolve the allotment issues, on June 10, 1872, Congress enacted The Homestead Act of 1872.  The Homestead Act granted 320 Ottawa and Chippewa Indians, as signatories to the 1855 Treaty of Detroit, including Cheboygan Band members, lands to effectuate the allotment scheme created in the Treaty. 17 Stat. 381 (1872).  3,213 acres were allotted to Band members under this Act in Townships 35 and 36 of Cheboygan County, which encompassed some of the area granted (but not given) to the Band in the Treaty of Detroit, and was near those lands held in trust for the Band.

41. This Act did not extinguish the Cheboygan Band's right to a reservation under the Treaties. And, although this statute gave land for homes to some Band members, it did not provide the Cheboygan Band collectively with a communal reservation as it had been promised by two Treaties. The Band remained "landless" and would be unfairly deprived of its rights in the future as a result.

42. Also in 1872, Secretary of the Interior Columbus Delano, a predecessor to Secretary Jewell, improperly interpreted the 1855 Treaty of Detroit as providing for dissolution of the tribes once annuity payments were completed in the spring of 1872, and declared that "tribal relations will be terminated" upon the completion of payments.[6] "Beginning in that year, the Department of the Interior, believing that the federal government no longer had any trust obligations to the tribes, ceased to recognize the tribes either jointly or separately."[7]

---

[6] *Grand Traverse Band of Ottawa & Chippewa Indians*, 369 F.3d at 962 n.2 (quoting *Letter from Secretary of the Interior Delano to Commission of Indian Affairs* at 3 (Mar. 27, 1872)) (recognizing Secretary Delano's interpretation to be incorrect).

[7] *Id.*

**B. The "Burn Out" of the Cheboygan Band and its Repercussions**

43. From 1860 to 1900, the Band resided in Indian Village on Colonial Point,[8] living in a total of twenty cabins where the members of the Band farmed, raised livestock, hunted, gathered, and fished.  The men sold crafts, such as baskets and blankets. The land was valuable because of the timber growing on it.

44.  Within a few years of their purchase, the six land patents the Band placed in trust with the Governor of Michigan between 1845 and 1850 were taxed by the county treasurer in a haphazard and inconsistent manner that was contrary to the terms of the trust conveyance.

45. Over the several decades after the lands were placed in trust, the Band attempted to pay its taxes, but was turned away.  On other occasions, the Band was never even notified the land had been taxed.  Eventually, the trust status of the Band's land was forgotten (or ignored). The county treasurer declared the land taxable and escheated the lands to the State of Michigan for non-payment of taxes.

46. Beginning in 1882, a wealthy timber-baron named John McGinn (or McGuinn) began obtaining tax titles to the Band's lands.  By 1896, McGinn had purchased all of the trust lands at a tax sale.

47. In October 1900, McGinn, the local sheriff, and several deputies armed with a writ of assistance forcibly removed Cheboygan Band members from their homes at Indian Village.  This tragic event is referred to as the "Burn Out."  While the men of the Cheboygan Band were collecting their paychecks, the officers ejected the women, children, and elderly from their

---

[8]  In the 1930s, the area around the Cheboygan Band's original settlement known as "Indian Village" at Indian Point had been renamed.  Indian Point, which jutted out into Cheboygan Lake, had been renamed "Colonial Point." *See* Dr. White Memo, at 61. The lake itself was renamed "Burt Lake." *Id.* Over time, the people of Indian Village became the "Burt Lake Band." *Id.*

homes, doused the 25 buildings standing on the properties with kerosene, and burned the village to the ground.  The Cheboygan Band was once more left homeless and destitute.

48. Having no money and no place to live following the "Burn Out," members of the Band walked as far as thirty miles away to move, building homes on the properties of those tribal members who already resided in areas such as Indian Road and Cross Village.

49. In 1903, the Michigan legislature passed a Joint Resolution in response to the tragic "Burn Out," which authorized the purchase of up to 400 acres of land "for the benefit and use of said (She-boy-gan) band of Indians and their descendants." Michigan Joint Resolution No. 20 (1903) (Attached hereto as **Exhibit B**).  Joint Resolution No. 20 recognized that the Band had lost its lands that were conveyed to the Governor of the State of Michigan in trust in 1846, 1847, and 1849, and the State acted due to its "moral obligation." (**Ex. B**). Despite the 1903 Joint Resolution, the State of Michigan never purchased any lands for the Cheboygan Band.  The Joint Resolution remains valid law today, but the Executive Branch of the State has never acted to purchase and allocate any lands for the Band.

## C.  United States Recognizes its Treaty Obligations to the Cheboygan Band

50. In 1911, the United States recognized and complied with its Treaty obligations owed to the Cheboygan Band.  On June 22, 1911, the United States filed a bill of equity against McGinn in the United States District Court for Eastern Michigan. *United States v. John W. McGinn and A.L. Agate*, Equity No. 94.  The government sued on behalf of the "Cheboygan band of Indians [which] is now and was at all the times mentioned in this bill of complaint a tribe of Indians under the care, control, and guardianship of the plaintiff and said band is now and was at all times mentioned in this bill of complaint recognized by the plaintiff through its chiefs or head men which it annually elects."  Complaint, at ¶ 1 (emphasis added).

51. The Complaint filed by the United States affirmatively states that "the said Band of Indians purchased the said land from the plaintiff under its general land laws and patents from the said land were issued to the Governor of Michigan and his successors in office **in trust** for the said Cheboygan Band of Indians." Complaint, at ¶ 2 (emphasis added).

52. The lawsuit sought to have all previous conveyances and land patents to McGinn set aside, cancelled, and the writ of assistance declared null and void.  This relief, if granted, would have resulted in fee simple ownership in the six properties being returned to the Cheboygan Band.  The members of the Cheboygan Band relied upon the United States to protect their interests pursuant to the federal government's Treaty obligations.

53. Through its actions, and through its statements describing the Cheboygan Band in federal court, fifty years after the Treaty of Detroit, the United States government once again recognized the Cheboygan Band as an independent Indian nation.  These actions constitute the last time the federal government officially has recognized that it has a government-to-government relationship with the sovereign Cheboygan Band, and its descendants, the Burt Lake Band.

54. On May 31, 1917, the federal court dismissed the United States' lawsuit on the grounds that that the written instrument signed by Cheboygan Band members in 1848 conveyed the land in question to the Governor of Michigan in fee absolute. *See United States v. Shepherd and Ramsey*, Equity No. 94 (E.D. Mich., May 31, 1917).  The court therefore held that no trust relationship had been created with the State and that the lands were appropriately subject to State taxation.

55. Federal District Court Judge Clarence W. Sessions ruled, in part, that:

The Cheboygan Indians were a small band and have never been treated, considered or recognized as a nation or a tribe. Their lands, whether held as

communal property by the band or in severalty (held separately) by the individual members, were not tribal lands and hence were not within the prohibition of the General Act of Congress forbidding conveyance of lands belonging to a nation or tribe of Indians without consent of the Government. **Whatever may have been the earlier status of these Indians, by treaty, in 1855, the tribal organization of the Ottawa and Chippewa Indians of Michigan was dissolved** . . . To all appearances the Federal Government abandoned and relinquished all right of guardianship over these Indians and their property more than a third of a century before the present suit was instituted . . . The question upon which the decision of this case hinges is whether these lands were taxable. That question must be answered in the affirmative. . . . Upon the full performance of treaty (1855) obligations, the dissolution of the tribal organization of the Ottawa and Chippewa Indians of Michigan, and their final attainment of citizenship (1850 Michigan constitution) . . . the Government relinquished its right of guardianship over these Indians and their property and cannot now represent them . . . A decree will be entered dismissing the Bill of Complaint without costs.

Department of Justice File No. 158012, RG 60, National Archives II (emphasis added).

56. Judge Sessions mistakenly and inaccurately[9] believed that the United States no longer had a relationship with the Band because the fictitious entity referred to in the 1836 Treaty of Washington "dissolved" and became separate groups. That made-up confederation, "Ottawa & Chippewa Tribe of Indians," that the United States referred to in 1836 was never a group in the first place, and could not be dissolved because all the Tribes were autonomous.  Even if a confederation was "dissolved," the United States reaffirmed its relationship with the separate and sovereign "Cheboygan band" contemporaneously when it provided land to the Band in the 1855 Treaty of Detroit.  In fact, the Band's sovereignty, unlike the rest of the signatories to the Treaty of Detroit, is uniquely bolstered by its independence during negotiations of the Treaty of Detroit, and the act of signing the Treaty on behalf of only the Band's members a year after all other

---

[9] This interpretation of the "dissolution" provision in Article V of the 1855 Treaty of Detroit has been ruled as error. *See Grand Traverse Band of Ottawa & Chippewa Indians*, 369 F.3d at 961 ("[T]hen-Secretary of the Interior, **Columbus Delano, improperly severed the government-to-government relationship** between the Band[s] and the United States, ceasing to treat the Band[s] as . . . federally recognized tribe[s].") (emphasis added).

parties had signed.[10]   Therefore, the Cheboygan Band, at all times a separate group of Indians, was never "dissolved," and the United States' obligations were never "relinquished."

57. The Cheboygan Band urged the federal government to appeal the court's decision, but no appeal was filed.

58. By way of comparison, the Huron Potawatomi Indians recorded a deed conveying their lands to the Governor of Michigan in perpetuity, utilizing the exact same language as the Cheboygan Band did in conveying their land to the Governor in 1845.  The Huron Potawatomi continue to live on their reservation lands held in trust to this day.

### D.  The Band's Attempts at Reaffirming Federal Recognition

#### a.  The Band's Unanswered 1935 Petition

59. In 1934, Congress enacted the Indian Reorganization Act ("IRA"), also known as the Wheeler-Howard Act. (June 18, 1934, ch. 576, 48 Stat. 984).

60. This Act "sought to strengthen tribal governments and restore the Indian land base." S. Rep. No. 111-247, at 2 (2010) (internal quotations omitted).  One of the main objectives of the Act was to restore tribal land held in trust because it was "essential to tribal self-determination." *Id.* at 3.  One of the co-sponsors, Congressman Howard of Nebraska, stated that purpose of the IRA was "to build up Indian landholdings until there is sufficient land for all Indians who will beneficially use it." *Id.* at 2-3 (quoting 78 Cong. Rec. 11,732 (1934)).

61. Section 5 of the IRA provided authority to the Secretary of the Interior to "acquire land in trust for the benefit of any tribe that was federally recognized at the time of trust land acquisition." *Id.* at 4.

62. Section 19 of the IRA describes those eligible to reorganize as "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all

---

[10] *See supra* ¶¶ 31-34.

descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation . . . ." 25 U.S.C. § 479. By its very language, the statute applied to the Cheboygan Band as a federally recognized Tribe living within the area ceded to Michigan Indians by the 1836 Treaty of Washington. The IRA thus provided a vehicle by which the federal government could reaffirm the Cheboygan Band's rights as a sovereign Tribe for the first time since 1917.

63. A successful petition under the IRA would enable a Tribe like the Cheboygan Band to hold elections after the petition was granted, to reorganize its political structure in a manner mandated by the IRA, and finally restore its permanent trust lands to renew self-determination.

64. The Band acted swiftly to invoke its rights under the IRA for reorganization of this Tribe, which had twice been recognized by the United States in 1836 and 1855 ("IRA Petition"). On May 13, 1935, 41 adult members of the Burt Lake Band submitted a Petition to John Collier, the then Commissioner of Indian Affairs of the DOI, asking for permission to organize their tribal government under the IRA. That Petition was supplemented with a letter from Congressman Prentiss Brown of Michigan requesting the BIA's assistance in obtaining and achieving reorganization.

65. Each of the 41 signatories to the Petition was a direct lineal descendent or married to at least one person of Indian blood who appeared on: (1) the federal government's field notes ("Durant Field Notes of 1908-09") which listed and organized Tribes and its members who were still owed annuity payments under existing Treaties; (2) land allotments or homesteads pursuant to the 1855 Treaty of Detroit and Homestead Act; (3) or both. (**Ex. A**).

66. Today, nearly 80 years later, the BIA has yet to issue a formal decision officially granting or denying the Cheboygan Band's IRA Petition.

67. Instead of the BIA deciding the matter, the Burt Lake Band was left with a "non-decision." The BIA made an informal, internal decision that was treated as a conclusive resolution of the Band's rights within the DOI for all practical purposes.  That "non-decision," however, was never set forth in a formal order or communicated to the Burt Lake Band. Accordingly, there was no basis on which the Band could file a lawsuit in federal court seeking judicial vindication of its legal rights.

68. Initially, in 1935, the BIA began accepting petitions which gave Tribes an opportunity to vote on reorganization and elect tribal leaders immediately under the IRA. 25 U.S.C. § 476.  Four Michigan tribes with communal land were authorized to hold elections within months of enactment in 1934. *See* McClurken Memo, at 4.

69. But, pursuant to the IRA, the Burt Lake Band, and other "landless" Michigan tribes like it, were placed in a deliberate "catch-22": they could not vote to reorganize until they obtained reservation lands, and they could not purchase reservation lands until they had voted. *Id.*  Through this device, the federal government once again sought to avoid its compliance with Treaty and statutory obligations to the Burt Lake Band.

70. In comparison, the BIA granted three other Tribes in Michigan the ability to vote on reorganization under the Act despite not having communal lands, merely because the Treaties they had signed in the 19th century did not establish deadlines for the close of the allotment periods like the Treaty of Detroit and Treaty of Washington had done for the Cheboygan Band. *See* McClurken Memo, at 5.

71. The BIA's investigation into the Burt Lake Band's eligibility, which resulted in this discriminatory "non-decision," was riddled with inconsistencies and indiscretions. Commissioner Collier tasked two BIA officials, Mark L. Burns ("M.L. Burns") and Peru Farver,

with investigating the northern Michigan tribes' IRA petitions.  Their correspondence is the only remaining basis to decipher the agency's action, because the BIA never issued a formal decision under the IRA.

72. Upon receiving the Band's IRA Petition, Commissioner Collier asked Burns on July 23, 1935 for any information regarding the "Cheboygan Band of Indians" and its status. (Attached hereto as **Exhibit C**).  On August 15, 1935, Burns replied to Collier, stating that these "Indians should not come under the Indian Reorganization Act due to the fact that they are <u>not enrolled</u> or <u>do not live on any reservation</u>,[11] but I think something can be done under the State Rehabilitation Program to help improve economic conditions." (**Ex. C**) (emphasis added).

73. In subsequent correspondence, Burns mistakenly reported that no northern Michigan tribe had lived on a reservation for more than a century.  This, of course, was false because the Burt Lake Band owned lands in trust that had served as its communal reservation as recently as 1896 until the "Burn Out." *See* McClurken Memo, at 6.

74. In a 1936 letter to Commissioner Collier, Burns concluded that these "landless" tribes could not be eligible unless land was provided for them: ". . . either arrangements must be made to purchase lands for these people or they should be definitely informed that they cannot be considered under the Act." Bureau of Indian Affairs, Central Classified Files, Mackinac Agency, 9634-1936, 066 (hereinafter "BIA Correspondence"), M.L. Burns to Commissioner of Indian Affairs (April 6, 1936).  Burns preferred the second option, which would prevent reorganization of the Band and several other similarly "landless" tribes because the finances and effort required

---

[11] "During the New Deal era, the BIA failed to properly account for documents or overlooked particular groups, such as the Burt Lake Band of the Chippewa Indians in Michigan." Trond Erik Jacobsen, <u>The Identity of Evidence: Documentary Evidence in the Federal Acknowledgement Process</u>, University of Michigan (2014), available at https://deepblue.lib.umich.edu/bitstream/handle/2027.42/110356/trond_1.pdf;...1.

to carry out this task would be too much "**even though it is found that these people are eligible to come under the Act**." *Id.* (emphasis added).

75. Acting in arbitrary and contradictory fashion, however, Burns recommended that the neighboring "landless" Grand River Ottawa and Little Traverse Bay Band tribes be acknowledged: "I feel that they are entitled to come under the Reorganization Act, altho [sic] they have <u>no reservation</u>, <u>nor are they enrolled</u>." BIA Correspondence, M.L. Burns to Commissioner of Indian Affairs (June 16, 1936) (emphasis added).  Both Tribes were signatories to the Treaty of Washington and Treaty of Detroit, and both Tribes' sovereign status were also improperly severed in 1872 as well.

76. The fate of the Cheboygan Band and other "landless" Michigan tribes who were not granted reorganization consequently rested on Congress to appropriate money for the purchase of reservation lands for eligible tribes so that they could qualify under the IRA. *See* McClurken Memo, at 4.

77. The individual in charge of the United States' efforts to reorganize Michigan tribes under the IRA, Frank Christy, secured an option on 7,000 acres of land in Emmet County, Michigan to reestablish a land base for Ottawa bands that did not hold communal lands, including the Burt Lake Band.  Christy anticipated that these lands would be acquired pursuant to the IRA and placed in trust for those landless Tribes.  During the Great Depression, however, Congress never appropriated any funds for carrying out the provisions of the IRA or for land acquisition for "landless" Treaty tribes. Thus, the option was never exercised. *See id.* at 3-4.

78. Commissioner Collier agreed with Burns that the financial burden of carrying out the federal government's legal obligations to the Michigan tribes would become the determinative factor in its IRA decision, not their right or eligibility to organize under the IRA. *See id.* at 7-8.

79. By Commissioner Collier's own interpretation of the IRA, the tribes in the "1836 treaty area" were clearly Indians of a recognized Tribe: "Section 19 of the act defines the term Indian . . . **A recognized tribe is one with which the government at one time or another has had a treaty or agreement or those for whom reservations or lands have been provided** and over whom the government exercises supervision through an official representative." BIA, Branch of Acknowledgment and Research (BAR), John Collier to Ben Shawanessee (April 24, 1935) (emphasis added); McClurken Memo, at 5.

80. By 1938, Collier began to withdraw from making a final decision for groups like the Cheboygan Band.  He even recommended that the BIA undertake efforts to suppress the landless Tribes' ability to qualify for reorganization.  One of his letters commanded that no other BIA official should "attempt to set up any additional or supplementary educational or supplementary welfare agencies for the Indians of Lower Michigan that in any way to tend to recognize Indians as a separate group of citizens."  *See* McClurken Memo, at 9.

81. In a separate letter to Senator Burton Wheeler of Montana, one of the co-sponsors of the IRA, Collier discussed the Grand River Ottawa group, which was a neighbor of the Burt Lake Band. Collier indicated that his "letter does not mean that we have made a final decision but at the same time with the funds available and the demands made upon them by the Indians who we really consider our responsibility, we are not disposed to take any action at this time." BIA Correspondence, Collier to Sen. Wheeler (April 18, 1938).

82. In 1939, BIA official Peru Farver, who initially recommended to Commissioner Collier that the "landless" Michigan tribes, such as the Cheboygan Band, be reorganized under the IRA, wrote that, due to the BIA's failure to decide or to publish a formal order:

> This issue will be kept alive for many years in view of the fact that most of the
> groups in the upper peninsula have been recognized and we are likewise

> contributing to the Chippewas of Lower Michigan.  In other words, the Ottawas and Potowatomies are the only tribes in Michigan which have been denied assistance under the Indian Reorganization Act.

Branch of Acknowledgment and Research (BAR), Peru Farver to Commissioner of Indian Affairs (Dec. 1, 1939).  Thereafter, no further memoranda or correspondence appear in the administrative record for the Cheboygan Band's IRA Petition.  The record contains no final decision on that Petition.

83. In essence, the BIA's "non-decision"—its refusal to make or to publish a final decision on the Band's Petition—was based on budget constraints rather than the Burt Lake Band's legal rights under the provisions of the IRA.  By failing to make any decision, the BIA denied the Band's rights by its inaction; depriving them of the notice required by the Due Process Clause, that a "non-decision" had been made on its Petition; and deprived it of the right to such judicial review of the BIA's *de facto* decision.

84. The Band believed they were still recognized based on their Treaties with the United States.  The members did not find out about these internal correspondence within the DOI until the 1980s when it gathered documentation for another petition for federal recognition.

85. Furthermore, a tribe was not *required* to reorganize under the IRA in order to establish or maintain federal recognition.  In fact, a number of tribes that elected to reject reorganization maintain federal acknowledgement as a sovereign Tribe today.  Thus, the BIA's unlawful and arbitrary "non-decision," which amounted to a refusal to grant the Cheboygan Band's IRA Petition, should have no bearing today on the BIA's consideration of whether the Band is federally recognized.  Rather, the lack of finality and the basis for its "non-decision" demonstrated the Band's right to be acknowledged.

**b.  Burt Lake Band's Efforts To Obtain Recognition After World War II**

86. At the time of the BIA's "non-decision," many Burt Lake Band and Ottawa men were serving in the U.S. armed forces during World War II.  Consequently, the issue of self-government was de-prioritized within the Band.  When the soldiers returned home, however, they formed a federal acknowledgement movement called the Northern Michigan Ottawa Association ("NMOA").  The NMOA adopted a constitution, by-laws, and a tribal government to pursue claims before the Indian Claims Commission ("ICC") for lack of compensation for the lands sold to the federal government in the 1836 Treaty of Washington.

87. In 1970, the NMOA finally won a multimillion dollar award before the ICC. The BIA, however, refused to distribute the monies to the Band specifically on the ground that these Indians were not a part of a federally recognized Tribe, despite being heirs of Treaty signatories.

88. Throughout the 20th Century, the members of the Band have endeavored to restore their lost lands. They have worked with every Governor of Michigan since the BIA's "non-decision" and dozens of members of Congress.  They have enlisted the support of Michigan Indian Legal Services and the Native American Rights Fund (NARF) to attempt to receive housing services and lands from the state government.

89. The Catholic Church has also lent its support by donating land to the Burt Lake Band in 1991 near its original entrusted lands on Indian Road, Burt Lake Township, for tribal ceremonial and burial purposes.

90.  Additionally, addressing the issues presented by the lost and stolen lands of the Burt Lake Band was one of the primary reasons for the establishment of the Michigan Commission on Indian Affairs (MCIA) by the Governor of Michigan in 1957.  The MCIA, acting on State authority, officially recognized the Burt Lake Band as one of ten historic Indian tribes.  The Burt

Lake Band is today the only one of the ten not listed by the DOI as a recognized Tribe in the Federally Recognized Indian Tribe List Act of 1994.  The federally recognized Michigan tribes have acknowledged the Burt Lake Band as the successor to the Cheboygan Band that signed the 1836 Treaty of Washington and the 1855 Treaty of Detroit.  They thereby supported the reaffirmation of the Burt Lake Band's status as a federally-recognized Indian tribe.

91. In 1978, the Band organized a committee of its members— ranging all over Michigan now due to the deprivation of their communal home—to begin to organize a more formal modern tribal government.  This committee was the seed that grew into the present-day governmental structure of the Band.

92. By April 1980, the Band established a formal committee to research its tribal history, develop a formal constitution, and seek new avenues to obtain tax-exempt status and federal recognition yet again.

93. As a result of the neglect and adamant refusal of the United States to abide by its statutory and fiduciary obligations, and its Treaty commitments to the Burt Lake Band, its members have been unlawfully divested of its aboriginal land, which in turn, has led to serious legal implications detrimental to the Band's members.  For years, members have been deprived of social services such as health benefits, educational assistance and other services and grants which Congress has provided for the benefit of Indian Tribes and Nations.  This denial of their statutory rights had a grievous adverse effect on the health and welfare of the members of the Burt Lake Band.

### c.   The Band's Submission of a Part 83 Petition for Federal Recognition

94. In 1978, the DOI promulgated Part 83 of its implementing regulations under the IRA, which set out a uniform procedure known as the Federal Acknowledgment Process, through

which Indian groups could seek federal recognition.  Part 83 "applies only to indigenous entities that are not federally recognized Indian tribes."  25 C.F.R. § 83.3.

95. There are two main avenues to become federally acknowledged under Part 83.  A tribe can be "recognized" for the first time, which requires that a tribe must produce evidence sufficient to satisfy seven criteria set forth in 25 C.F.R. § 83.7(a)-(g).  Or, a previously recognized tribe can be "re-affirmed" pursuant to § 83.12 whereby the petitioner would have to prove past recognition through treaties, acknowledgement of rights by the federal government, past allocation of land by the government, and must satisfy two of the same criterion set forth in § 83.7.

96. In 1980, the Burt Lake Band, at the encouragement of BIA officials, began compiling resources and documentation to create an exhaustive petition under the Part 83 process.

97. The BIA, for all intents and purposes, controls who can submit petitions and under what process to apply, by suggesting to tribes, like the Burt Lake Band, that it would consider a petition if it applied for "recognition" rather than "re-affirmation." As a result, the Band tailored its petition for application of federal recognition under Section 83.7.

98. On September 6, 1985, the Band filed a petition with the BIA, No. 101, for recognition as an Indian Tribe under the provisions of Part 83 ("Part 83 Petition").

99. The BIA placed the Petition on "active consideration" within two years. Yet no review of the Petition on its merits or final decision was made for over 20 years.

**d.   Events During Pendency of the Band's Part 83 Petition**

100. On March 31, 1983, during the pendency of the Petition, the DOI published in the Federal Register a list of all "potential pre-1966 Indian damage claims identified by or presented to the Department of Interior's Statute of Limitations Program as required by Sec. 3(a) of the

Indian Claims Limitation Act of 1982, Pub. L. 97-394." The notice indicates that "claims are grouped by Indian Tribes." 63 Fed. Reg. 13,698. The DOI included on page 394 of the list, claim F60474-003 for "Cheboygan Band Land," describing the claim as a "tax forfeiture." 63 Fed. Reg. at 13,876. The federal government used the same name over 100 years later that it used when it recognized "the Cheboygan band"[12] and granted it allotments of land under the 1855 Treaty of Detroit. Thus, while the DOI identified the Cheboygan Band here as an Indian Tribe under one federal statute, the Band's claims for formal recognition under another, the IRA, remained unanswered.

101. After the BIA refused to distribute funds to the Burt Lake Band from the NMOA's multimillion dollar award obtained in 1970, it was not until 1997 that Congress added a provision to the Michigan Indian Land Claims Settlement Act, Public Law No. 105-143, 111 Stat. 2663-64, to specifically provide payment of judgment funds to tribes that were not federally recognized like the Burt Lake Band.

102. Section 110 of the of the law reads: "In order to be eligible for tribal funds under this Act, a tribe that is not federally recognized or reaffirmed on the date of the enactment of this act . . . must be a signatory to either the 1836 treaty (7 Stat. 491) or the 1855 treaty (11 Stat. 621); [and] must have a membership that is predominantly Chippewa and Ottawa; . . . ." 111 Stat. 2663.

103. The Band, skeptical that accepting judgment as anything other than a Tribe federally recognized by Congress like all other Tribes who already received payment, chose not to apply for payment at that time in fear that the BIA would use this acceptance to support a denial of

---

[12] *See supra* ¶ 37.

their Part 83 Petition and bolster a possible argument that the Band is not a federally recognized Tribe.

104. On January 6, 1986, the Michigan Commission on Indian Affairs, acting on State authority, officially recognized ten Indian Tribes in the State of Michigan, including the Burt Lake Band. This declaration, by formally recognizing the Burt Lake Band of Ottawa and Chippewa Indians as a sovereign Tribe, was intended to support the Band's Part 83 Petition and to encourage the federal government to follow suit.

105. On March 30, 2001, after receiving no decision from its 1935 IRA Petition and its Part 83 Petition for over 15 years, the Burt Lake Band filed a lawsuit in this Court requesting that the BIA be required to adjudicate its Part 83 Petition. This Court dismissed the lawsuit, in part, because neither the "Treaty of Washington nor the Treaty of Detroit excuses plaintiff from exhausting its administrative remedies" first. *Burt Lake Band of Ottawa and Chippewa Indians v. Norton*, 217 F. Supp. 2d 76, 79 (D.D.C. 2002). Thus, the Band was required to wait until the BIA would consider its Petition, however long that would take.

### e. Denial of the Part 83 Petition

106. Finally, in 2006, after 20 years of "active consideration," the BIA rejected reaffirmation of Burt Lake Band's status under Part 83 of the Code of Federal Regulations. Final Determination for the Burt Lake Band of Ottawa and Chippewa Indians, Inc., 71 Fed. Reg. 57,995, 57,995 (Oct. 2, 2006) ("Summary of Part 83 Decision") (to be codified at 25 C.F.R. pt. 83).

107. According to the Part 83 Decision, the BIA found that the Burt Lake Band satisfied four of the seven criteria in 25 C.F.R. § 83.7. *Id.* at 57,995.

108. The four criteria the BIA found the Band had met were (1) Section 83.7(a), which required the Band to have been identified as an American Indian entity continuously since its last acknowledgment, which was in 1917; (2) Section 83.7(d), which required that the Band provide a copy of its governing document, a constitution first ratified by its members in the 1980s; (3) Section 83.7(g), which required the absence of evidence that the Band was the subject of congressional legislation expressly forbidding or terminating their Federal relationship, and which was met because two federal Treaties exist that establish that Congress intended to and had established a relationship with the Band; and (4) Section 83.7(f), which required that Band membership be comprised principally of persons who are not members of any acknowledged North American Indian tribe.

109. Notably, the four criteria that the BIA met were all objective standards, requiring little of the thousands of costly pages worth of proof and records the Band produced as required by the BIA.

110. The three criteria the BIA found the Band did not meet, conversely, were entirely subjective standards.

111. First, the BIA found that the Band did not meet Section 83.7(b), which requires that a "predominant portion" of the group must exist as a distinct community.  To satisfy this criterion, the Band submitted photographs, sign-in sheets, funeral records, and interviews. *Id.* at 57,995.  The BIA found that the Burt Lake Band was not a distinct social community because its "core social community" predominantly included members of a federally recognized tribe, the Little Traverse Bay Band ("LTBB"). *Id.*   The BIA's decision thus was based on a material internal inconsistency.  The agency found that the Burt Lake Band was a distinct <u>tribe</u> for

purposes of Section 83.7(f), but because its larger community included LTBB members, it was not a distinct *community* for purposes of Section 83.7(b).[13]

112. Second, Section 83.7(c) requires that a petitioner must maintain political influence and authority over its members. The BIA found that the Burt Lake Band failed to meet this criterion because there was insufficient evidence of a governing body on a continual basis since 1917. *Id.* at 57,996.  Unlike other "landless" Michigan Tribes, the Band was not given the ability to elect officials among its members in 1935 and organize a political structure as required by the IRA, because the BIA never acted upon (and has yet to act upon) the Band's IRA Petition.

113. Finally, Section 83.7(e) requires that membership consist of individuals who descend from a historical Indian tribe. *Id.*  The BIA found that of the 320 members listed as Band members, only 68% could document descent back to 1900.  Of the 102 who could not, 53 had "married into the group" and 49 lacked sufficient documentation.  *Id.* Since this ruling, the Burt Lake Band has properly updated its membership rolls so that <u>every</u> member can trace their

---

[13] Interestingly, this is the only requirement in § 83.12 that the Band would then fail to satisfy if the Band chose to petition again, but this time, for "re-affirmation": "(a) The petitioner may prove it was previously acknowledged as a federally recognized Indian tribe . . . by providing substantial evidence of unambiguous Federal acknowledgment, . . . including, but not limited to, evidence that the petitioner had:

    (1) Treaty relations with the United States;
    (2) Been denominated a tribe by act of Congress or Executive Order;
    (3) Been treated by the Federal Government as having collective rights in tribal lands or funds; or
    (4) Land held for it or its collective ancestors by the United States.
(b) Once the petitioner establishes that it was previously acknowledged, it must demonstrate that it meets:
    (1) **At present, the Community Criterion**; and
    (2) Since the time of previous Federal acknowledgment or 1900, whichever is later, the Indian Entity Identification Criterion and Political Authority Criterion."  25 C.F.R. § 83.12 (emphasis added).

descent back to the Durant Roll of 1908— a list of Tribes and its members conducted by the BIA to determine who remained entitled to Treaty annuity payments— or the "Burn Out" of 1900.

114. The BIA's 2006 denial piggybacked off its prior "non-decision" of the IRA Petition. The BIA denied the Burt Lake Band reaffirmation despite recognizing that the Burt Lake Band maintained a strong Indian community, and its sovereign status was supported by scholars, local and state officials, and other tribes.   In its 223 page opinion (not published in the Federal Register), the BIA claimed that Commissioner Collier's definition of an eligible group under the IRA[14] does not conflict with its 2006 decision, and that Collier's correspondence only referenced other "landless" tribes, like the Grand Traverse Band, but could not have shed light on the similarly-situated Burt Lake Band.   *Summary under the Criteria and Evidence for Final Determination Against Acknowledgement of the Burt Lake Band of Ottawa and Chippewa Indians, Inc.*, Department of Interior, Petition 101, at 74 (Sept. 21, 2006) ("Full Part 83 Decision").

115. In its Part 83 review, the BIA also failed to take into account the Burt Lake Band's unique history whereby it unlawfully had its lands taken from it and was also deprived of its rights by the same government that denied this Petition.

116. First, the Band's failure to possess communal land, which occurred through no fault of its own and was the consequence of more than a century of exploitation, served as the basis for the BIA's conclusion that the Band lacked sufficient community ties under Section 83.7(b).[15]

---

[14] *See supra* ¶ 79.

[15] "Trust land is essential to a tribes' ability to protect or promote their historic, cultural and religious tires to land where their ancestors lived. Trust land is also vital to tribal economic development and self-government as tribes provide a wide range of governmental services to their members including, running schools and health clinic, administering housing, and providing court, law enforcement and numerous other key social and governmental services." S. Rep. 111-247, at 1 (2010).

But the Band was never provided a reservation by the federal government despite the promises in two Treaties. BIA officials themselves helped the Band create those permanent trusts in 1845-1850, and the Band lost its lands entrusted to the State of Michigan in the "Burn Out" of 1900, yet the BIA refused to recognize that a lack of communal land would cause the Band to be more dispersed.

117. Second, while the Band's members awaited a decision on the Band's Part 83 Petition (and even after denial), some of its members enrolled in federally recognized Michigan Tribes to obtain federal services, such as health care and prescription drug assistance, that only a federally recognized Tribe member was legally entitled to, but were denied as members of Burt Lake Band. This action was also advised by one or more employees of the BIA. Thus, without its own federal status and access to federal programs, the Band's larger community and membership roll would have logically contained other Tribe's members and thus would have failed the flawed analysis in Section 83.7(e). The BIA failed to consider this reality or even its own involvement in the Band's current situation in its finding that the Band had not satisfied Sections 83.7(b) and (e).

118. Third, the BIA found that the Band lacked sufficient political structure over its community under Section 83.7(c). Many tribes that previously have been granted reorganization under the IRA could meet this criterion due to their recognized political structure. Some of these previously reorganized Tribes had already spent decades with proof of an appropriate governmental body. The Burt Lake Band, however, by virtue of the BIA's purposeful and discriminatory "non-decision" 70 years earlier, was substantially disadvantaged in meeting this criterion even before applying.

119. By comparison, the Huron Pottawatomi Nation also petitioned for recognition under Part 83, and in 1996, the BIA granted the Huron Potawatomi's petition and recognized it as an Indian tribe within the meaning of federal law.

120. In its decision, the BIA actually relied on the language of an identical deed of trust from the Huron Potawatomi to the Governor of Michigan as the Burt Lake Band's deeds[16] in concluding that Huron Potawatomi Nation had successfully established their right to reaffirmation under Part 83.

121. Within its analysis of the Huron Potawatomi's petition, the BIA recognized that the Tribe "had prior unambiguous Federal acknowledgement in 1833, the date of the last treaty signed by the Potawatomi of Huron Band's chiefs." 60 Fed. Reg. 66,315 (Dec. 21, 1995). It also stated that the Huron Potawatomi satisfied Section 83.7(c) (political influence), a factor the Burt Lake Band purportedly did not meet, because "from 1934 to 1970, the leadership was by a committee closely associated . . . **on the Pine Creek reservation**." *Id.* at 66,315 (emphasis added). The Burt Lake Band, however, has no communal and permanent reservation to congregate and to exert its leadership.

122. By further comparison, in 1996, the Delaware Tribe— a "landless" east coast Tribe forced to combine with Cherokees in Kansas after the Trail of Tears, and that signed a Treaty with the United States in 1867— was granted a final decision by the BIA that would "reconsider and retract" its Part 83 denial of acknowledgment and, instead, granted federal recognition without going through another Part 83 process on the ground that its Treaty was conclusive evidence of its federal acknowledgment. *See Cherokee Nation of Oklahoma v. Norton*, 241 F. Supp. 2d 1368, 1373 (N.D. Okla. 2002), *rev'd on other grounds*, 389 F.3d 1074 (10th Cir. 2004).

---

[16] *See supra* ¶ 58.

123. The Tenth Circuit ultimately reversed the grant of recognition under the APA on an unrelated ground—that the Supreme Court had previously ruled that the text of the Delaware Tribe Treaty actually made their group a part of the Cherokee Tribe and that it was not sovereign. *See* 389 F.3d at 1076–77.

124. The court's decision left undisturbed, however, the BIA's conclusion that, barring other disqualifiers like the explicit text of the Delaware Treaty, the existence of a federal Treaty satisfied the criteria established by Part 83, and was conclusive evidence of federal recognition of a "landless" tribe that had lost its identity.  There is no comparable language in the Burt Lake Band's two federal Treaties making them a part of any other Tribe.  Accordingly, the logic of the BIA's prior conclusion applies to the Band with full effect, and warrants its recognition.

125. During the more than 20 years that the BIA delayed and denied reaffirmation to the Burt Lake Band, seven other "landless" Tribes in Michigan that were also denied reorganization under the IRA, including the Huron Pottawatomi, were granted federal reaffirmation decades later.

126. The seven other "landless" Tribes were reaffirmed in a variety of ways.  The Sault Ste Tribe of Chippewa Indians was reaffirmed by a Memorandum of the Commissioner of Indian Affairs on September 7, 1972.  In addition to the Huron Potawatomi, the BIA, through Part 83 petitions, reaffirmed the sovereign status of the Grand Traverse Band of Ottawa and Chippewa Indians on May 27, 1980; and the Gun Lake Tribe in August 23, 1999.  By Act of Congress, the Lac Vieux Desert Band of Lake Superior Chippewa Indians was reaffirmed on September 8, 1988; and by another Act, the Little Traverse Bay Band of Odawa Indians, the Little River Band of Ottawa Indians, and the Pokagon Indian Nation were all reaffirmed on September 21, 1994.

127. The denial of the Band's Part 83 Petition was based on and confirmed the results of a century of illegal treatment of the Band by the federal government.  The Burt Lake Band is the only "landless" Michigan tribe that has not been recognized under Part 83.

128. The Band, therefore, is the only "landless" Michigan Tribe that has been adversely affected by the highly rigid and subjective analysis undertaken by the BIA pursuant to the original provisions of Part 83.  The BIA itself has since admitted that the process it applied in the years leading up to the denial of the Band's Part 83 Petition was "broken," "non-transparent," and "unpredictable." Final Rule, 80 Fed. Reg. 37,862, 37,862 (July 1, 2015) ("Final Part 83 Rule").[17]

129. Rather than review the Burt Lake Band's Part 83 Petition in a non-arbitrary manner, the BIA defaulted on its obligations under the APA.  Instead, it tried to avoid its responsibility by recommending that "Congress may take legislative action to recognize groups it finds have merit even though they do not meet the specific requirements of the acknowledged regulations." Full Part 83 Decision, at 19.

**e. Congressional Attempts at Reaffirmation**

130. In 2007, in response to the BIA's denial of reaffirmation, two Michigan congressmen introduced a bill in the House of Representatives to reaffirm the status of the Burt Lake Band.

131. Prior to the vote, the Republican majority placed the bill under a "suspension vote," which requires a two-thirds vote rather than a simple majority under a suspension of House

---

[17] "To summarize . . . the [part 83] process is slow, expensive, inefficient, burdensome, intrusive, non-transparent, inconsistent, and unpredictable." *Hearing on the Federal Acknowledgment Process Before the H. S. Comm. On Indian, Insular and Alaska Native Affairs*, 114th Cong. 2 (April 22, 2015) (testimony of Assistant Secretary - Indian Affairs Kevin Washburn).

Rules.  House Resolution 948 received a majority vote of 240-176, but it did not obtain the required two-thirds majority vote.  The bill failed to pass.

132. With the support of many in Congress, the same bill was re-introduced every session until 2011.  The bill has never reached another vote.

### E. BIA's Adoption of Regulatory Prohibition on Reapplying For Federal Acknowledgment Under the 2015 Amendments to Part 83

133. On June 29, 2015, in response to criticisms that the Part 83 process lacked transparency, efficiency, and consistency, the BIA amended its previously "broken"[18] process for federal recognition under Part 83 of Title 25 of the Code of Federal Regulations because it was designed to make tribes, such as the Burt Lake Band, fail.  Final Part 83 Rule, at 37,863.

134. The preamble to the Proposed Rule states that the purpose for these changes to the process was to promote "fairness and consistent implementation, and increasing timeliness and efficiency, while maintaining the integrity and substantive rigor of the process." *Id.* at 37,862.

135. The 2015 Amendments had been under consideration within the BIA since 2009, in an attempt to improve the process that had recognized only 17 tribes and denied 34 groups since 1978.  *Hearing on the Federal Acknowledgment Process Before the H. S. Comm. On Indian, Insular and Alaska Native Affairs*, 114th Cong. 2 (April 22, 2015) (testimony of Assistant Secretary - Indian Affairs Kevin Washburn).  Washburn's testimony laid out four guiding principles for amending the part 83 process: transparency, timeliness, efficiency, and flexibility. The fourth, flexibility, emphasized that the amended part 83 process should understand "the

---

[18] *See Hearing on the Federal Acknowledgment Process Before the H. S. Comm. On Indian, Insular and Alaska Native Affairs*, 114th Cong. 2 (April 22, 2015) (testimony of Assistant Secretary - Indian Affairs Kevin Washburn) (listing at least six Sen Indian Affairs members describing the part 83 process as "broken," "complicated," and in need of reform from 2007-2009).

unique history of each tribal community, and avoid[] the rigid application of standards that do not account for the unique histories of tribal communities." *Id.* at 4.

136. Under the Part 83 procedure that the Band underwent, the courts recognized that "a federal acknowledgment petition can be over 100,000 pages long and cost over $5 million to assemble; the BIA estimated time for completion of review is 30 years." *See Mackinac Tribe v. Jewell*, 829 F.3d 754, 758 (D.C. Cir. 2016) (citing Harry S. Jackson III, Note, *The Incomplete Loom: Exploring the Checkered Past and Present of American Indian Sovereignty*, 64 RUTGERS L. REV. 471, 497 (2012)). In fact, the BIA itself admitted that "72% of . . . currently recognized federal tribes could not successfully go through the [Federal Acknowledgment] process as it is being administered today." Jackson, *supra*, at 507 (quoting Reverend John Norwood, Delegate's Report, THE NATIONAL CONGRESS OF AMERICAN INDIANS ANNUAL CONFERENCE 1 (2010)).

137. The 2015 Amendments differ from the process the Band was considered under in several important ways. First, based on an "inconsistent and unpredictable" criteria, the amended process promotes a "consistent baseline," meaning "if a particular amount of evidence or a particular methodology was sufficient to satisfy a criterion in a decision made in 1980, 1990 or 2000, that baseline threshold remains the same for petitioners today." *Information Fact Sheet*: *Highlights of the Final Federal Acknowledgment Rule (25 CFR 83)*, Bureau of Indian Affairs (June 29, 2015), available at: https://www.bia.gov/cs/groups/public/documents/text/idc1-030769.pdf. This would mean, if the Band was to petition for acknowledgment now, the BIA would be required to consider that it concluded the "landless" Huron Potawatomi in 1995 and the Delawares in 1996 satisfied the federal recognition process because of its treaty relationship with the United States.

138. Second, and most significantly, the amended part 83 prohibits any tribe from re-petitioning for federal acknowledgment under Part 83 if it previously had applied under that process, and its petition had been denied. 25 C.F.R. § 83.4(d).  As amended, Section 83.4(d) provides:

> "The Department will not acknowledge . . .
>
> (d) An entity that that previously petitioned and was denied Federal acknowledgment under these regulations or under previous regulations in part 83 of this title . . . . ."

139. During consideration of the amended Part 83 process, the DOI considered a proposal that would allow "limited re-petitioning" based on the condition that the opponents of the original petition consented (known as a "third-party veto").  Opponents of "limited re-petitioning" argued that re-petitioning was "unnecessary"; "inefficient"; and "unfair to *other* tribes." Part 83 Final Rule, at 37,874 (emphasis added).  Most astonishingly, the argument was made that re-petitioning "could result in acknowledgement of previously denied petitioners." *Id.*

140. Those in the DOI who strongly objected to the ban on re-petitioning did so on the ground that such a prohibition "treats petitioners unequally"; would violate Equal Protection and Due Process clauses of the Fifth Amendment; would "prevent getting to the truth of whether a tribe should be acknowledged"; exceeds the BIA's authority; is "politically motivated"; and is "based on an invalid justification (established equities) that fails to consider petitioners' interests." *Id.* at 37,874-75.

141. On September 25, 2013, the Burt Lake Band submitted comments on the proposed changes, and provided those comments to the BIA's Office of Regulatory Affairs & Collaborative Action. ((Attached hereto as **Exhibit D**).  The Band, in general, "support[ed] the revisions," but suggested that Part 83 confer authority to the Assistant Secretary to reaffirm any Tribe omitted from federal recognition due to the BIA's previous error by denying a Tribe under

the "broken" Part 83 process, which would save a small and not wealthy Tribe such as the Band from a long and expensive Part 83 petition yet again.  Additionally, the Band supported the proposed rule for re-petitioning because it would be "grossly unfair" to allow new petitioners to be recognized under less stringent criteria without giving the same opportunity to a Tribe denied under a process the BIA itself admitted was "broken." (**Ex. D**).

142. Ultimately, the BIA rejected these arguments and adopted in the final rule an absolute prohibition on re-petitioning.  Despite the fact that the Burt Lake Band had waited over 20 years only to be denied under a broken system, one of the tragic reasons the DOI rejected the proposed rule was because "the Department has petitions pending that have never been reviewed." Final Part 83 Rule, at 37,875.  It concluded that "allowing re-petitioning is not appropriate" because it would "be unfair to petitioners who have not yet had a review and would hinder the goals of increasing efficiency and timeliness . . . The part 83 Process is not currently an avenue for re-petitioning." *Id*.

143. The BIA's decision adversely affected the Band by depriving it of the right to supplement and revise a petition for recognition to the BIA that addressed the issues on which the BIA denied in its original Part 83 Petition.

144. As a result, the Burt Lake Band is currently caught in a clear-cut example of arbitrary and capricious behavior by the federal agency charged with handling the United States' relations with sovereign Tribes.  The BIA's capricious "non-decision" was based primarily on the established historical fact that Burt Lake Band's lands were violently stolen from it. This arbitrary "non-decision" has given the BIA reason to deny the Band's subsequent claims and petitions as recently as 2006.  And, the Burt Lake Band is forever precluded from re-petitioning under the IRA.  The seven other "landless" Michigan tribes who were denied under the IRA

decades ago have since been reaffirmed in a variety of ways. This Court has become the Burt Lake Band's last remaining avenue to obtain the federal recognition its members deserve under the governing provisions of federal law.

145. Additionally, the BIA's amended Part 83, which implements a less stringent criteria and bans re-petitioning, is also an example of arbitrary and capricious agency behavior.  After decades of encouragement by the BIA to help the Band to navigate the government's laws and procedures to be restored as a recognized Tribe, the BIA's 2015 Amendments foreclose any opportunity that the BIA would assist or recognize the Band in the future.  In addition to waiting over twenty years for the BIA's denial, the Band has spent time and effort since 2006 updating its membership rolls to become a sufficiently documented Tribe (§ 83.7(e)) and distinct community from the Little Traverse Bay Band (§ 83.7(b)). It has brought this suit, in part, to shed light on the BIA's failures to ever decide its IRA Petition, which would have enabled the Band to satisfy the political influence requirement of Section 83.7(c). The Band's history with the United States and its current factual showing— if it were allowed to re-petition under Part 83 as amended—demonstrate that the Burt Lake Band was and is a federally recognized Indian Band. The BIA's ban on re-petitioning improperly favored administrative efficiency over meritorious adjudication of petitions.

### F.  The Band's Recent Appeals For Answers To Defendants

146. On July 20, 2016, Congressman Bart Stupak and Bruce Richard Hamlin, Chairperson of the Burt Lake Band, sent a letter to Defendant Secretary of the Interior Sally Jewell requesting that the DOI or BIA finally review and grant the Burt Lake Band's 1935 IRA Petition, which has yet to be adjudicated in over 80 years while the heirs of the 41 signatories wait helplessly. (Attached hereto as **Exhibit E**).

147. That same day, a letter was sent to Defendant Acting Assistant Secretary of the Interior Lawrence Roberts seeking clarification that the Burt Lake Band could not petition for "reaffirmation" or "recognition" of their rights pursuant to two Treaties with the federal government under the new Part 83 process. (Attached hereto as **Exhibit F**).

148. There has been no response by any Defendant.

149. Mr. Hamlin's great-great-great-great grandfather, Kiminichigan, was the interpreter and negotiator of the Treaty of Washington in 1836. Kiminichigan's grandson, Augustine Hamlin, Jr. was one of two interpreters and negotiators of the 1855 Treaty of Detroit, a Treaty that Judge Sessions in 1917 claimed the Cheboygan Band was not a party to. Bruce Hamlin's great-grandfather, Moses Hamlin, was personally served the writ of assistance by McGinn prior to the "Burn Out" in 1900.

150. In a 1980 research memorandum to Michigan Congressman Robert Davis, Dr. James McClurken opines on the Burt Lake Band's status as the Band prepared for its Part 83 Petition. Dr. McClurken noted that "[i]t is ironic that while the Bureau of Indian Affairs carried on formal negotiations with Ottawa and Chippewa leaders over the issue of reorganization between 1934 and 1980, BIA officials continually denied the existence of the tribes' polity." Dr. McClurken further described the Band's situation and unique history as a "special case which calls for expedited action" on their requests for acknowledgment. *See* McClurken Memo, at 13.

151. Currently, every last member of the Burt Lake Band can trace their lineage back to the families of those forcibly removed and left destitute during the "Burn Out" of 1900. The Bands' cemetery still remains near the site of the original Indian Village. Members of the Burt Lake Band continue to use the ancient Ottawa language in gatherings together, and most members of the Band continue to live in Michigan in the hope that if they are persistent, the

federal government will finally grant them due process of law, as it is required to do under the United States Constitution, and finally restore the federal recognition they have been deprived of for more than a century, despite the provisions of two Treaties and governing federal statutes.

## CLAIMS FOR RELIEF

### (A) The BIA's "Non-Decision" on the IRA Petition

### COUNT I: Violation of the Administrative Procedure Act

152. Plaintiff repeats and re-alleges ¶¶ 1 through 151 as if set forth fully herein.

153. The BIA has never issued a formal decision that informed the Burt Lake Band, and its predecessor, the Cheboygan Band, that its IRA Petition has been denied or provided a rationale for its actions. The BIA reached an informal, internal "non-decision" decades ago, ignored its obligations to issue a final decision, and eventually subsequently used that "non-decision" in its denial of the Band's Part 83 Petition as support for its finding that the Band could not satisfy the criterion, which effectively resulted in denial of the Band's Petition for reorganization.

154. The BIA's "non-decision" constitutes final agency action subject to the Court's review because the BIA has not indicated any intent since 1939 to revisit the Band's IRA Petition or act upon it further.  Therefore, the Band has exhausted its administrative remedies, yet, it could not appeal this "final decision" to the courts because no such decision ever was publicly issued by the BIA or DOI.  In the alternative, exhaustion of administrative remedies is not required when unreasonable administrative delay, such as the tremendous 81 year wait for the decision on the Plaintiff's 1935 IRA Petition, "would render the administrative remedy inadequate." *Mackinac Tribe v. Jewell*, 829 F.3d 754, 759 n.2 (D.C. Cir. 2016) (citing *Sw. Bell Tel. Co. v. FCC*, 138 F.3d 746, 750 (8th Cir. 1998)).

155. The failure by the BIA to issue a final, public decision on Plaintiff's 1935 IRA Petition for reorganization violates basic principles of administrative law that protects the Band's Due Process rights in the administrative procedures that govern regulatory proceedings under the statute and the Administrative Procedure Act ("APA") in numerous ways.

156. The BIA has completely failed to provide a statement of grounds for its effective rejection of the IRA Petition, and failed to articulate a satisfactory explanation for its decision-making and actions;[19] The BIA has offered the Burt Lake Band no decision whatsoever, let alone an explanation for that decision.

157. The APA requires that any "agency action" that the Court concluded was "unlawfully withheld" or unreasonably delayed shall be compelled. *See* 5 U.S.C. § 706(1); 5 U.S.C. § 551(13) (defining "agency action").  The BIA has "unlawfully withheld" a final decision and failed to officially consider, decide and conclude the IRA Petition for over 80 years.[20]  As a result, the BIA has left the Band without any rights to appeal or provide new grounds for re-petitioning.

158. Any action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," "without observance of procedure required by law" or "unsupported by substantial evidence" must be set aside. 5 U.S.C. § 706(2).  The BIA's failure to issue a formal decision, produce an explanation, or provide any evidence as to its "non-decision" and subsequent failures to act since 1934 was done without observance of its delegated authority.

---

[19] *See Ardila Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 463 (D.C. Cir. 2016) ("[T]he core requirement [of § 555(e)] is that the agency explain why it chose to do what it did.") (internal quotations omitted); *Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 195 (D.C. Cir. 2010) (finding the DOI violated § 555(e) because it "provided no explanation" to conclude its action was the product of reasoned decisionmaking).

[20] *See Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 180 F. Supp. 2d 130, 136 (D.D.C. 2001) (ordering the BIA to decide plaintiff's petition within one year where "unreasonable delay" was found to have occurred after six years).

The lack of reasoning for granting some "landless" Michigan tribes the ability to reorganize in 1934, and, at the same time, denying the Burt Lake Band federal recognition without any justification besides its being "landless" is wholly unsupported by evidence.  Moreover, because the BIA effectively denied the Burt Lake Band the ability to reorganize under the IRA based on budgetary concerns rather than under the terms of the IRA and has failed to right this wrong for over 80 years, the Defendants' "non-decision" constitutes "arbitrary or capricious" action.

### COUNT II: Violation of the Due Process Clause of the Fifth Amendment

159. Plaintiffs repeat and re-allege ¶¶ 1 through 151 as if set forth fully herein.

160. The BIA has deprived, and continues to deprive, the Band of its procedural rights under the Due Process Clause to seek judicial redress of adverse agency action in violation of the IRA by its failure to inform the Band that it failed to decide, and effectively rejected, its Petition. *See Propert v. D.C.*, 948 F.2d 1327, 1331 (D.C. Cir. 1991) ("[T]he due process clause requires, at minimum, that the government provide notice and some kind of hearing before final deprivation of a property interest.").

161. The BIA's "non-decision" has also violated the Band's substantive Due Process rights.  The lack of reasoned agency action has deprived Band members and their heirs of federally recognition; the Band's liberties as a sovereign Tribe; and property, including, but not limited to, essential services and benefits provided by federal statutes that members of federally recognized Tribes receive.  *See Berrigan v. Sigler*, 358 F. Supp. 130, 138 (D.D.C. 1973), *aff'd*, 499 F.2d 514 (D.C. Cir. 1974) (finding a violation of substantive due process where agency action is arbitrary and unreasonable under the circumstances).

### COUNT III: Violation of the Equal Protection Component of the Fifth Amendment

162. Plaintiff repeats and re-alleges ¶¶ 1 through 151 as if set forth fully herein.

163. The Defendants have violated and continue to violate the equal protection component of the Due Process Clause of the Fifth Amendment to the Constitution of the United States by their refusal to take formal action on the Band's IRA Petition.

164. The *de facto* refusal of Defendants and their predecessors in office to grant the Band's IRA Petition on the basis that it lacks a communal reservation, where similarly situated Tribes that engaged in relations with the United States based upon federal Treaty were granted the same reorganization that the Band sought, constitutes invidious discrimination contrary to the Equal Protection component of the Due Process Clause of the Fifth Amendment.

165. The Burt Lake Band has been denied Equal Protection of the laws because the BIA has deprived the Burt Lake Band of the very same rights its neighboring Tribes received—tribes that were similarly signatories to the 1836 Treaty of Washington, the 1855 Treaty of Detroit, recipients of land under the Homestead Act of 1872, recognized as sovereign Tribes by the State of Michigan, and also historically under the care and guardianship of the United States as evidenced by the federal government's position in the 1911 lawsuit it filed on the Band's behalf.

**(B)  BIA's 2015 Amendments of Part 83**

<u>**Count IV: Arbitrary and Capricious Agency Action in Violation of the APA**</u>

166. Plaintiffs repeat and re-allege ¶¶ 1 through 151 as if set forth fully herein.

167. 25 C.F.R. § 83.4(d) as amended in 2015 ("2015 Amendments") unlawfully prohibits the Band from obtaining a fair review of its status as a sovereign Indian Band under the revised criteria where it was previously denied such status under a repealed procedure that the BIA has admitted was "broken" and that was designed to deny federal recognition.

168. The Band has a legal right to bring this challenge to the revised Part 83 regulation even though it has not filed an updated petition with the BIA since seeking re-petition in light of

Part 83's threshold, absolute ban on re-petitioning would have been futile and resulted in certain denial.[21]

169. Congress did not grant the BIA an express delegation of authority to prohibit Tribes from re-petitioning under 25 C.F.R. § 83, and the BIA has not been given implicit legislative delegation where such a ban is manifestly contrary to the purpose of the federal acknowledgment process. *See* 25 C.F.R. §§ 83.2 (Purpose), 83.3 (Scope).  The Defendants have not acted pursuant to congressionally delegated authority by amending the Part 83 rules to prohibit the BIA from considering a new petition by the Band, which would be designed to remedy the concerns identified by the BIA in response to the Band's petition under the prior, admittedly "broken" Part 83 procedures.

170. Moreover, the very scope of the BIA's acknowledgment process, Part 83, "applies only to indigenous entities that are not federally recognized Indian tribes." 25 C.F.R. § 83.3 (emphasis added).

171. Consequently, Part 83 only applies to a small pool of unrecognized tribes in the United States that, by its very nature, can only shrink in size over time.  Yet, the BIA chose to restrict non-federally recognized tribes to one "bite at the apple" to obtain the rights that its members are entitled to under federal statutes, regardless of the substantive merits of the petitioner's augmented petition.

172. A federal agency cannot refuse, in an arbitrary and capricious manner, to act on petitions for redress to vindicate a regulated entity's statutory rights based on its own

---

[21] *See Safari Club Int'l v. Jewell*, 842 F.3d 1280 (D.C. Cir. Dec. 6, 2016) (futility is an exception to the requirement of exhausting administrative remedies) (quoting *Grid Radio v. FCC*, 278 F.3d 1314, 1319 (D.C. Cir. 2002)); *see also Honig v. Doe*, 484 U.S. 305, 327 (1988) (futility may occur when agency administrative processes cannot provide the relief sought by the petitioner); *Shawnee Trail Conservancy v. U.S. Department of Agriculture*, 222 F.3d 383 (7th Cir. 2000) (futility requires certainty that agency action will be adverse).

administrative convenience and efficiency concerns. Congress did not authorize or intend that the BIA would be allowed to sit on a petition for redress for twenty years, processing petitions at an average rate of less than two per year,[22] and then cite the agency's own track record of extreme delay as a justification for foreclosing the ability of a Tribe to re-petition under a different and more equitable set of criteria.

173. Thus, the BIA's refusal even to consider evidence that demonstrates that the agency's position was erroneous constitutes arbitrary agency action within the meaning of 5 U.S.C. ¶ 706.[23]

174. The 2015 Amendments of Part 83 eliminate any possibility that the BIA would consider supplemental facts or actions—such as the discovery of historical documents, updating membership rolls, and amending constitutions or political structure—that could successfully correct its error in considering the Band's original Petition. As a result, the rule is unlawful because it allows the BIA to arbitrarily ignore deserving, unrecognized tribes' petitions for self-determination and recognition consistent with the governing statute simply because the BIA preferred to save time, effort and agency resources for its own administrative convenience.

### Count V: Violation of the Due Process Clause of the Fifth Amendment

175. Plaintiffs repeat and re-allege ¶¶ 1 through 42151 as if set forth fully herein.

176. The Defendants' adoption of 25 C.F.R. § 83.4(d) prohibits the Band from re-petitioning for recognition (or re-affirmation) under Part 83 violates the procedural due process component of the Due Process Clause of the Fifth Amendment.

---

[22] *See Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 40 (D.D.C. 2000) ("[T]he Bureau considers an average of 1.3 petitions per year.").

[23] *See Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

177. Since the enactment of the IRA, Congress has emphasized the United States' policy that, due to the severe loss of Indian lands and tragic treatment towards Indians, the restoration of its sovereign status and lands are vital to promote self-determination.  In 1975, Congress passed the Indian Self-Determination and Education Assistance Act, and again reiterated the federal policy concerning the United States' relationships with Indian tribes:

> The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes . . . In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

25 U.S.C. § 5302 (Congressional declaration of policy).

178. Thus, the longstanding Congressional policy of "*assisting* Indian tribes" to develop independent communities has been undermined and eroded by the BIA's action in 2015 to ban re-petitioning.

179. By restraining the Band's ability to show it is entitled to recognition despite the fact that a supplemental showing or objective reconsideration may prove the Band's members are entitled to the rights and services accompanying a tribe's recognition, the ban on re-petitioning violates the right guaranteed under the United States Constitution to petition the government for redress of grievances.

180. The Burt Lake Band has been substantially prejudiced by the BIA's imposition of a blanket refusal to reconsider a revised petition previously denied under a system where the fairness and reliability of existing rules have been called into question, and where the Band has subsequently taken action and gathered evidence to enhance its showing to address the BIA's prior comments.

## Count VI: Violation of the Equal Protection Component of the Fifth Amendment

181. Plaintiffs repeat and re-allege ¶¶ 1 through 151 as if set forth fully herein.

182. The Burt Lake Band is now part of a group of Tribes that may deserve federal recognition under the provisions of Part 83, but are foreclosed from re-petitioning despite material upgrades to its factual showing in support of recognition, such as the updating of its membership rolls and the conclusion that the Band is entitled to reorganization under the IRA, merely because the Band exercised its statutory right to apply for recognition prior to the 2015 Amendments.

183. The Burt Lake Band is similarly situated to current tribal petitioners whose applications are being reviewed by the BIA under its updated process.  The Burt Lake Band, however, is absolutely prohibited from being considered under this revised procedure without regard to its rights under the IRA or the merits of its supplemental factual case.[24]

184. The Burt Lake Band has therefore been denied Equal Protection of the laws because the BIA has imposed a threshold prohibition on the Band's seeking federal acknowledgment under the Part 83 process, when similarly situated and "landless" Michigan tribes such as the Huron Potawatomi and the Grand Traverse Band have been accepted and federally recognized under Part 83; and when similarly situated tribal petitioners deserving of federal acknowledgment will be considered under the improved and less stringent criteria.

---

[24] *See Keenan v. Bd. of Law Examiners of State of N. C.*, 317 F. Supp. 1350, 1360 (E.D.N.C. 1970) ("Administrative inconvenience is, however, insufficient justification for an arbitrary, over inclusive regulatory classification."); *Williams v. San Francisco Unified Sch. Dist.*, 340 F. Supp. 438, 445 (N.D. Cal. 1972) ("It is not sufficient to uphold a practice otherwise violative of the standards governing the equal protection clause to say that the alternative to the classification challenged would create a situation which might require more work on the part of the administering agency.").

185. Furthermore, the BIA's ban on re-petitioning creates a situation where a tribal petitioner could succeed, rather than fail, under the current Part 83 process because of the application of a "consistent baseline" and a similarly-situated Tribe, such as the Burt Lake Band, is precluded from re-petitioning under the same law.  Rather, the Burt Lake Band was subjected to an inconsistent, rigid, and subjective analysis that failed to consider  the success of previous petitioners similar to the Band, such as the other "landless" Michigan Tribes and signatories to the same Treaties, who have almost all been successfully recognized.  This consideration is now required by the BIA's "consistent baseline" application, and this situation fails to treat all similarly-situated petitioners equally and fairly under the law.

(C)      **Federally Recognized List of Indians Act of 1994**

**COUNT VII: Federal Recognition Pursuant To 25 U.S.C. § 1530**

186. Plaintiffs repeat and re-allege ¶¶ 1 through 151 as if set forth fully herein.

187. The Constitution vests Congress with plenary authority over Indian Affairs. *See* The Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103-454, § 103(1), 108 Stat. 4791 (1994) (codified at 25 U.S.C. § 5130 *et seq.*) (Congressional Findings).

188. Federal acknowledgement requires that the Secretary of the Interior place a Tribe on a regularly updated list of recognized tribes which are eligible for programs and services provided by the United States. *See* 25 U.S.C. § 1531.

189. Congress set forth three separate ways for a tribe to achieve federal recognition in the 1994 Act: "Indian tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in part 83 of the Code of Federal Regulations denominated 'Procedures for Establishing that an American Indian Group Exists as an Indian Tribe;' **or by a**

**decision of a United States court**." Pub. L. 103-454, § 103(3) (Congressional findings) (emphasis added).

190. The Burt Lake Band has diligently fought for its rights through Congress and numerous BIA avenues (1934 IRA Petition and 1980 Part 83 Petition); however, the failure of Congress to adopt legislation and the illegal and arbitrary decisions of the BIA and DOI foreclosed those avenues.

191. Two federal Treaties with the Burt Lake Band's predecessor, the Cheboygan Band, remain in effect today. No congressional termination has caused the Band's government-to-government relationship to lose its status. The Secretary of the Interior's failure to include the Burt Lake Band on the list of federally recognized tribes pursuant to 25 U.S.C. § 1531 violates Congressional policy, the law of the land, and perpetuates centuries of historical injustice.

192. This Court has the power and authority to order that the Burt Lake Band be placed on the Federally Recognized Indian Tribe List based upon the abovementioned tortured history of the Band, which has twice entered into Treaties with the United States that recognized its existence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Burt Lake Band of the Ottawa and Chippewa Indians respectfully requests that this Court:

1. Order the Bureau of Indian Affairs, the Department of the Interior, and its officers responsible for conducting the federal government's relations with Indian Tribes to fairly adjudicate the 1935 IRA Petition on the merits, to issue a formal decision, and to grant reorganization and federal recognition under the statute;

2. Declare the rule promulgated in 25 C.F.R. § 83 that bans limited re-petitioning under the new procedures and criteria adopted by the Bureau of Indian Affairs in 2015 to be unlawful, unconstitutional, and unenforceable;

3. Order the Bureau of Indian Affairs, the Department of the Interior, and its officers responsible for conducting the federal government's relations with Indian Tribes to consider and adjudicate a supplemental petition from the Band for recognition or reaffirmation of its status as a sovereign Indian Band under the amended regulations set forth in 25 C.F.R. § 83;

4. Order that the Plaintiff be placed on the Federally Recognized Indian Tribe List pursuant to this Court's judicial authority under 25 U.S.C. § 5130; and

5. Grant Plaintiff such further relief as the Court deems just, proper, and equitable.

Respectfully submitted,

_____/s/ John F. Cooney_____
Moxila Upadhyaya (D.C. Bar No. 494373)
John F. Cooney (D.C. Bar No. 936336)
Bart Stupak (*pro hac vice* application forthcoming)
VENABLE LLP
575 7th Street NW
Washington, DC 20004
(202) 344-4000
MAUpadhyaya@Venable.com
JCooney@Venable.com
BStupak@Venable.com

*Counsel for Plaintiff*